***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Chapman with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
3. On August 1, 2001, the employee-employer relationship existed between the employee-plaintiff and the defendant-employer.
4. On August 1, 2004, the defendant-employer was insured through Berkley Insurance Company of the Carolinas.
5. This claim was denied by defendants pursuant to a timely-filed Form 61.
6. It is stipulated that all parties have been correctly designated and that there is no question as to the misjoinder or non-joinder of parties.
7. The parties stipulate that plaintiff's average weekly wage was $503.00, yielding a compensation rate of $355.00.
In addition, the parties stipulated into evidence the following:
1. A packet of documents, which included medical records and reports, Industrial Commission forms, the depositions of Theresa Perez and Rosario Bello Garcia, a police report and discovery responses.
2. Social Security records which were submitted on September 16, 2004.
The Pre-Trial Agreement dated June 14, 2004, which was submitted by the parties, is incorporated by reference.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was forty-two years old at the time of the hearing before the deputy commissioner, and who is originally from Mexico, began working for defendant-employer in January 2001 as a sweeper operator. His job involved driving a sweeper truck to the locations on a daily route sheet, getting out of the truck at each location to use a blower to blow trash from around the buildings into the parking lot, driving the sweeper truck over the parking lot to pick up the trash, and, when the bags on the truck became full, removing and replacing them. He reported to work at 9:00 p.m. and worked until 8:00 in the morning.
2. During the time he was employed by defendant-employer, plaintiff was reprimanded on three occasions for taking the company truck to his apartment complex. He had been told that this was not permissible when he was hired, yet he had been caught on these occasions by his supervisor, who lived at the same apartment complex, or by the G.P.S. tracking device which was placed in his truck at times. His last reprimand occurred on July 25, 2001. On that date, his employer told him in the presence of his supervisor that he would be terminated if he took the company truck home again.
3. On Tuesday, July 31, 2001, plaintiff reported for work at 9:00 p.m. and picked up his assigned sweeper truck. There was a printed schedule inside the truck which showed the properties he was supposed to sweep that night and the order in which he was to sweep them. It was the usual Tuesday-night schedule which he had driven on previous occasions. The route went first to Union Town Center in Indian Trail, then to Union Square in Monroe, and to Matthews Corners in Matthews before returning to Charlotte to go to K-Mart, then Cotswold Mall, and finally to Royal Plaza. Plaintiff drove off in the truck alone, as was normal for his job.
4. Plaintiff has alleged that, during the early morning hours of August 1, 2001, he was almost through sweeping the last property, Royal Plaza, when he was accosted by a man with a gun who demanded money; that the man forced him to drive the truck to his home because he had no money; that he went inside his apartment while the man waited outside in the truck; that he got $100.00 from upstairs and, without speaking to his brother who was awake and in the kitchen, he went back out to the truck to give to the money to the man waiting there; that the assailant then forced him at gunpoint to drive away, and then threatened to kill him; that he parked the truck, then jumped out of it and started to run, but the assailant shot him; that he fell and was shot again; and that the assailant ran out of bullets so he climbed back into his truck and drove away but soon lost consciousness due to his injuries. His allegations have not been accepted as credible.
5. At 5:49 that morning, a resident at plaintiff's apartment complex called the 911 dispatcher to report that there had been a shooting. Police officers were then sent to the scene to investigate. The sweeper truck was discovered at a nearby intersection with plaintiff unconscious in the driver's seat. He was transported by ambulance to the hospital. Due to loss of blood, he was not sufficiently responsive to communicate at that time. Around this same time, Philip Brooks, who was president of defendant-employer and who was unaware of plaintiff's whereabouts, received a call from management at Cotswold Mall asking why the property had not been swept. Consequently, he began driving to the mall to do the job. While en route, a police officer called him to inquire about the truck which was stopped at the intersection near plaintiff's apartment complex. At that point, Mr. Brooks diverted his truck to the reported location of plaintiff's assigned truck and sent a supervisor to sweep the properties plaintiff had not swept that night.
6. Upon arriving at plaintiff's assigned truck, Mr. Brooks found the schedule sheet which plaintiff was to fill in during his shift, showing times of arrival and departure at each property, and the sheet was blank. There was a great deal of blood in the truck, and he subsequently drove it back to the office and began to clean it so that the truck could be used that night. In the process of cleaning the truck, he found plaintiff's cellular telephone, which he turned in to the police. The supervisor who was sent to complete plaintiff's route found none of the Charlotte properties had been cleaned, so they had to be cleaned during the daytime on Wednesday.
7. Police officers interviewed two women who lived at the apartment complex and who reported having seen some of what had occurred. Theresa Perez told them that she had seen three assailants, whom she described in some detail, and that one of them had shot plaintiff. Agibail Salinas said that she only saw one assailant, and that she had her husband call 911. Both of the women testified in the case. Ms. Perez's testimony was so inconsistent and contradictory that it was not found to be credible.
8. Plaintiff was shot twice in the left arm. The bullet which hit his upper arm also entered his chest. The bullet which struck his forearm, severed his radial artery and caused a severe radial fracture. Dr. Sims, an orthopedic surgeon, performed surgery on August 2, 2001, to ligate the artery and to repair the fracture using a plate and screws. The bullet fragments found on x-ray in plaintiff's flank and mid-back areas were never removed. Diagnostic testing did not show that they caused any intra-abdominal or visceral injury. Plaintiff did not have health insurance coverage and could not otherwise afford to have the bullet fragments removed since defendants denied his workers' compensation claim.
9. Plaintiff had had a prior workers' compensation claim after a fairly serious hand injury in Texas and had received substantial benefits pursuant to that claim. Consequently, he was familiar with the program. He had not swept the Charlotte properties as he testified and should have arrived in Charlotte between 3:30 a.m. and 4:00 a.m. on Wednesday morning, which would have been a couple of hours before he was shot. Since there was no evidence that he was ever working at the Charlotte properties that morning, he likely went home to his apartment, in violation of orders from his employer. Furthermore, it was implausible that he left an assailant in his truck, went inside his apartment and did not tell his brother or anyone else living in the apartment with him what was happening so that they could call the police. It was also suspicious that he failed to use his own cellular telephone to call for assistance after driving away from the scene of the shooting.
10. In any event, plaintiff's testimony regarding what happened on August 1, 2001, has not been accepted as credible. The evidence established that he had not swept the Charlotte properties on his list and that he had, therefore, not been where he was supposed to have been. The motives for the assault were not disclosed by the evidence, but no evidence has been produced to indicate that the assault was due to a risk associated with his employment.
11. While at his apartment complex during the early morning hours of August 1, 2001, plaintiff was not only deviating from his work duties for personal reasons, he was also violating a specific order given by his employer that he not take the company truck home. He knew at the time that he would be terminated if he were caught doing that again, and defendant-employer did, in fact, subsequently terminate his employment because of this fourth violation. Since plaintiff was engaged in misconduct that morning, the termination was justified.
12. Although plaintiff was shot during working hours on 1 August 2001, his injuries did not arise out of or in the course of his employment with defendant-employer.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Since plaintiff was engaged in a distinct departure from his work-related travel for personal reasons on the morning of August 1, 2001, in violation of a specific order from his employer, and since the motives of the assault were not proven to have been reasonably related to a risk associated with his employment, the injuries he sustained when he was shot at his apartment complex did not arise out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2 (6);Anderson v. Northwestern Motor Company, 233 N.C. 372 (1951); Jacobs v.Sara Lee Corporation, 157 N.C. App. 105 (2003); Robbins v. Nicholson,281 N.C. 234 (1972).
2. Plaintiff is not entitled to the benefits under the Workers' Compensation Act for his injuries of August 1, 2001. N.C. Gen. Stat. §97-2, et seq.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits is hereby Denied.
2. Each side shall pay its own costs.
This the 10th day of October, 2005.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER